**ALYSSA B., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.**

**No. S–12410.**

Supreme Court of Alaska.

Aug. 17, 2007.

---

A.B., San Ysidro, California, pro se.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Alyssa B. appeals from an order terminating her parental rights to her daughter, Jaclyn.[1] Alyssa contends that the superior court violated her due process rights by conducting the termination trial in her absence and terminating her parental rights because she was mentally ill. Alyssa also raises various other challenges to both the termination proceedings and her preceding adjudication proceedings. Because we conclude that

---

1. "Alyssa B." is a pseudonym that we used in a previous appeal in this case, *Alyssa B. v. State, Dep't of Health & Soc. Servs. (Alyssa B. I)*, 123 P.3d 646 (Alaska 2005). "Jaclyn" is a pseudo- nym we used in another related appeal, *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527 (Alaska 2004).

Alyssa's due process rights were not violated when the termination trial was held without her, and because the superior court's termination order was not based on her mental illness alone, we affirm the termination order. Because the rest of Alyssa's claims lack merit, we affirm those rulings as well.

## II. FACTS AND PROCEEDINGS

In March 2005 the Department of Health and Social Services filed a petition to terminate Alyssa B.'s parental rights to her daughter, Jaclyn. Jaclyn had been adjudicated a child in need of aid in October 2003 and was committed to the department's custody in February 2004.

Alyssa chose not to be represented by her court-appointed attorney at the termination trial. The trial was delayed several times while the court tried to find Alyssa an attorney who would be acceptable to her; Alyssa also filed numerous motions and requests for continuances. Ultimately, the court appointed the Palmer Public Defender Agency to serve as Alyssa's advisory counsel. On May 18, 2006, a notice of the date of the termination hearing was mailed to Alyssa's current address in Talent, Oregon. In July Alyssa filed a change of address form, notifying the court that she had moved to San Ysidro, California. The calendaring notice was re-sent to Alyssa's updated address on July 26.

The termination trial was held on August 9, 2006. Alyssa failed to appear in person at trial. She briefly appeared telephonically at the outset, announced that she was on vacation in Mexico, and requested a continuance because she could not participate from there. Superior Court Judge Eric Smith refused to continue the trial yet again and advised Alyssa to obtain another phone card and call back. Alyssa objected to the trial proceeding without her, disconnected the call, and did not call back.

At trial, a department social worker testified that Alyssa had not had any contact with Jaclyn since February 2003 and had not completed a single element of the case plan for reunification with Jaclyn. The social worker also explained that because the daughter had bonded with her foster parents and was thriving in her current placement, the department's permanent plan was for the foster parents to adopt her.

An expert in clinical psychology testified that, based on a review of Alyssa's case history and other information, he believed that Alyssa suffered from severe psychological problems, that she was socially maladjusted, and that it would not be in Jaclyn's best interests to return the child to Alyssa's custody. The psychologist testified that, given Alyssa's failure to live up to her obligations as a parent and the daughter's solid attachment to her current parental figures, termination of Alyssa's parental rights was appropriate.

At the close of trial, the superior court found by clear and convincing evidence that Alyssa had abandoned Jaclyn because Alyssa had not worked on her case plan and refused all services, had made only minimal efforts to communicate with Jaclyn, and had not visited with her daughter for more than six months.[2] The court also found by clear and convincing evidence that Alyssa suffered from a mental illness that would result in substantial risk of harm to Jaclyn if the child were in her custody.[3] In addition, the court found by clear and convincing evidence that Alyssa had not remedied the causes or conditions that created the risk of harm to Jaclyn. The court further found that the department had made reasonable efforts to reunite Alyssa and her daughter, but that these efforts had failed because Alyssa would not accept the department's repeated offers of assistance. Last, the court determined that, given the child's need for permanency, it was in the daughter's best interests to terminate Alyssa's parental rights.

On September 5, 2006, the superior court issued its final order terminating Alyssa's parental rights.

Alyssa appeals.

**2.** *See* AS 47.10.011(1).

**3.** *See* AS 47.10.011(11).

## III. DISCUSSION

### A. Standard of Review

In order to terminate parental rights under AS 47.10.088, the superior court must find by clear and convincing evidence that

(1) the child has been subjected to conduct or conditions described in AS 47.10.011 [children in need of aid statute];

(2) the parent

(A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and

(3) the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts.[4]

The court must also find by a preponderance of the evidence that termination of parental rights is in the child's best interests.[5]

■ We review the factual findings underlying the superior court's termination order for clear error and will reverse a finding only if the record leaves us with a definite and firm conviction that the superior court has made a mistake.[6] Whether the superior court's factual findings satisfy the requirements of the CINA statutes and rules is a question of law that we review de novo.[7]

4. AS 47.10.088(a).

5. CINA Rule 18(c)(2)(C); AS 47.10.088(b), (c).

6. *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005).

7. *Id.* (citing *D.M. v. State, DFYS*, 995 P.2d 205, 207 (Alaska 2000)).

8. *Alyssa B. I*, 123 P.3d at 651.

9. We have held that "[a] claim is moot where a decision on the issue is no longer relevant to resolving the litigation, or where it has lost its character as a 'present, live controversy,' that is,

### B. Probable Cause Hearing, Adjudication, and Disposition

Alyssa's first set of arguments relate to the proceedings leading up to the order adjudicating Jaclyn a child in need of aid, entered in October 2003.

#### 1. Moot claims

■ Alyssa contends that the department acted illegally and unreasonably when it twice took emergency custody of Jaclyn in 2002; that the department acted wrongfully by failing to provide notice to the natural father before taking custody of Jaclyn; that the superior court denied Alyssa due process by not permitting her to call her mother as a witness at the probable cause hearing; that the court violated her constitutional rights when it found probable cause to believe that Jaclyn was a child in need of aid; that the court erred in admitting hearsay testimony at the probable cause hearing; and that it also erred in overlooking evidence that Jaclyn was not a victim of abuse or neglect.

Because Alyssa's claims concerning the department's decision to take custody of Jaclyn and the probable cause hearing are moot in light of the superior court's later decision adjudicating Jaclyn a child in need of aid, which we affirmed in *Alyssa B. I*,[8] we need not address these claims.[9]

#### 2. ICWA claim

■ Alyssa claims that the superior court lacked jurisdiction because Jaclyn is an Indian child under the Indian Child Welfare Act (ICWA).[10] She contends that ICWA applies because Jaclyn's father is a native Hawaiian.

where a party bringing the action would not be entitled to any relief even if he or she prevailed." *Clark v. State, Dep't of Corr.*, 156 P.3d 384, 387 (Alaska 2007) (quoting *Municipality of Anchorage v. Baxley*, 946 P.2d 894, 899 (Alaska App.1997) and citing *Maynard v. State Farm Mut. Auto. Ins. Co.*, 902 P.2d 1328, 1329 n. 2 (Alaska 1995)).

10. *See* 25 U.S.C. § 1911(b) (2007) (stating that "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe").

But the act defines "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village." [11] As the superior court correctly noted, native Hawaiians have not yet been recognized by Congress as Indian tribes for the purposes of applying ICWA.[12] Accordingly, this claim lacks merit.

### 3. Jury trial at adjudication

Alyssa argues that the trial court improperly denied her a jury trial at adjudication. We decided in *Alyssa B. I* that there is no right to a jury trial in CINA proceedings.[13] Our decision controls here.

### 4. Psychological evaluation before adjudication

Alyssa contends that the trial court erred in ordering her to undergo a psychological evaluation before adjudication. We upheld the superior court's ruling on this point in *Alyssa B. I*.[14] There is no need to re-decide the point here.

### 5. Rule 60(b) claims

■ Alyssa argues that the trial court erred in failing to grant her motion for relief from its judgment of adjudication under Civil Rule 60(b)(4).[15] It is not clear what Rule 60(b) motion Alyssa refers to; it appears that her argument could pertain to either of two filings. In September 2004 Alyssa filed what appears to be a Rule 60(b)(4) motion, challenging the department's decision to take custody of Jaclyn as an "illegal seizure in want of due process of law." Because this

motion apparently relates to the superior court's adjudication finding, which we affirmed in *Alyssa B. I*, this issue is now moot.

Alternatively, Alyssa's argument might pertain to a document and proposed order she filed in May 2006, citing Rule 60(b)(4) & (6).[16] This filing consists of a rambling thirty-two-page affidavit that fails to discuss the civil rule and appears to relate mostly to the department's initial decision to take custody of Jaclyn, an issue that is now moot. Because the point appears to be moot and Alyssa's briefing presents no colorable grounds for granting Rule 60(b)(4) relief, we find no merit to her argument on this point.

### 6. Ineffective assistance of counsel at adjudication

■ Alyssa argues that the trial court erred in refusing to grant her oral motion for a mistrial due to ineffective assistance of counsel at the disposition and permanency hearing following the superior court's order of adjudication. She claimed in her motion that her attorney had ignored her requests to file "numerous motions" on her behalf. The court declined to rule on the motion, indicating that it would consider the matter at a later time when it ruled on Alyssa's appointed counsel's request to withdraw.

It does not appear from the record that the ineffective assistance of counsel claim was addressed again. But regardless of the superior court's decision on the matter, we conclude that Alyssa's claim fails on appeal because it is inadequately briefed. Apart from her conclusory allegation of ineffective assistance of counsel, Alyssa provides no facts or legal authority to support her claim

---

**11.** 25 U.S.C. § 1903(8).

**12.** *See Arakaki v. Lingle,* 477 F.3d 1048, 1066–68 (9th Cir.2007) (observing that Congress and the executive do not yet recognize Hawaiians as federal Indian tribes); *Kahawaiolaa v. Norton,* 386 F.3d 1271, 1276, 1282 (9th Cir.2004) (noting that Congress has dealt with Hawaiians differently than Indian tribes).

**13.** *Alyssa B. I,* 123 P.3d at 648–49.

**14.** *Id.* at 650–51.

**15.** Alaska R. Civ. P. 60(b)(4) provides: "On motion and upon such terms as are just, the court

may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void."

**16.** Alaska R. Civ. P. 60(b)(6) provides: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of the judgment."

or otherwise enable meaningful appellate review.

## C. Claims Related to Termination

Alyssa's next set of arguments relate to the judicial proceedings leading up to the termination order, entered in September 2006.

### 1. Challenges to Judge Eric Smith

Alyssa argues that (1) the trial court erred in denying her peremptory challenge to Judge Smith before the termination trial; (2) Judge Smith erred in refusing to recuse himself for cause; and (3) Judge Smith erred in refusing to dismiss the case and disqualify himself due to an alleged pecuniary interest in the matter and "cooperative agreement" with Alyssa's adversaries.

■ Under Civil Rule 42(c), a judge or master may be peremptorily challenged as a matter of right.[17] But Civil Rule 42(c)(4) provides that a party waives this right to change a judge if the party knowingly participates before that judge in "[a]ny judicial proceeding which concerns the merits of the action and involves the consideration of evidence or of affidavits."[18]

■ Shortly after receiving notice that a petition of termination had been filed and that a hearing on the petition had been scheduled before Judge Smith, Alyssa filed a "Notice of Change of Judge," seeking to peremptorily challenge Judge Smith from the case. In challenging Judge Smith after receiving notice of the termination petition,

Alyssa appears to have implicitly viewed the termination proceeding as a separate proceeding from the previous adjudication and disposition hearings in her case, over which Judge Smith had presided. But this view misconstrues the character of a termination proceeding.

As recognized by Alaska's CINA Rules, when the state files a petition to terminate parental rights to a child who has already been adjudicated a child in need of aid, "[t]he termination hearing is a disposition hearing to the court on the question of whether the parental rights to [the] adjudicated child in need of aid should be terminated."[19] Hence, a termination proceeding is simply a procedural continuation of the earlier proceedings in the existing CINA case. And because it does not initiate a new proceeding, the petition does not create the right to a new peremptory challenge under Civil Rule 42(c).[20] Accordingly, Alyssa's time for exercising the peremptory challenge to Judge Smith ran from the notice of his assignment in the initial proceedings in the CINA case. That time had long expired, and because Alyssa had knowingly participated in previous judicial proceedings concerning the merits of that action, she retained no right to peremptorily disqualify Judge Smith under Rule 42(c) upon receiving notice that he would still be handling the case after the state filed the petition to terminate Alyssa's parental rights.

■ Alyssa's motion also sought to disqualify Judge Smith for cause, alleging that he was biased.[21] This claim lacks merit be-

---

**17.** Alaska R. Civ. P. 42(c)(1) provides in relevant part: "In all courts of the state, a judge or master may be peremptorily challenged as follows: ... In an action pending in the Superior or District Courts, each side is entitled as a matter of right to a change of one judge and of one master."

**18.** Alaska R. Civ. P. 42(c)(4)(i). The interpretation and application of the right to a change of judge under Rule 42(c) is a question of law that we review de novo. *Cook v. Rowland*, 49 P.3d 262, 264 (Alaska 2002) (citing *Barber v. Barber*, 915 P.2d 1204, 1208 n. 8 (Alaska 1996) and *Staso v. State, Dep't of Transp.*, 895 P.2d 988, 990 (Alaska 1995)).

**19.** CINA Rule 18(b).

**20.** For this reason, as is typical in this procedural setting, Alyssa's termination petition was filed under the same case number as the original CINA case, not under a new docket number. *Cf. Staso*, 895 P.2d at 990 (holding that "[a] refiled suit, which is assigned a new docket number, for which new filing fees are imposed, and for which new process must issue, provides this necessary bright-line" for determining whether there is a new right under Civil Rule 42(c) to disqualify an assigned judge).

**21.** We review for abuse of discretion a trial court's decision on an issue of recusal or a motion to disqualify a judge. *Carr v. Carr*, 152 P.3d 450, 458 (Alaska 2007); *Wasserman v. Bartholomew*, 38 P.3d 1162, 1170 (Alaska 2002). We "will reverse a judge's refusal to step down from

cause Alyssa fails to show that Judge Smith abused his discretion in refusing to disqualify or recuse himself; she does not establish that Judge Smith had either a conflict of interest or bias against her. We also point out that Alyssa's claim for an independent judge was separately reviewed and denied by Superior Court Judge John Suddock. Alyssa fails to establish any abuse of discretion in Judge Suddock's ruling.

### 2. Jury trial at termination

 Alyssa argues that the trial court erred in denying her a jury trial at termination. We conclude that a jury trial is not required in a termination hearing for the same reasons it is not required in an adjudication hearing under *Alyssa B. I.*[22] First, the Alaska Constitution only preserves a jury trial for legal causes of action, not those which are equitable in nature, and "[c]hild protection cases have historically been treated as matters of equity in Alaska."[23] Second, there is no due process right to a jury trial in CINA proceedings:

> Although [t]he private interest of a parent whose parental rights may be terminated . . . is of the highest magnitude, this interest must be balanced against the child's right to an adequate home and education and the state's interest in the child's welfare. Judges are well situated to make reliable findings in CINA cases, given their knowledge of and familiarity with the controlling law and the prior proceedings of the case. As for the government's interests, the department points out that jury trials in CINA proceedings could delay reunification or permanent placement, reduce judicial economy, increase the number of parents contesting adjudication instead of attempting to reach an agreement,

and compromise the department's ability to maximize its resources.[24]

We affirm the superior court's denial of a jury trial at termination.

### 3. Ineffective assistance of counsel

 Alyssa contends that she repeatedly requested that the court appoint her new counsel. She maintains that her advisory counsel, Laurel Bennett of the Palmer Public Defender Agency, refused to give her legal advice or become familiar with the case file; Alyssa goes so far as to argue that her advisory counsel actively "connive[d] at [her] defeat."

We have recognized that "[a] parent has a due process right to effective assistance of counsel in a termination of parental rights proceeding."[25] But Alyssa was not represented by an attorney. Instead she elected to proceed pro se. The court appointed an attorney to serve as Alyssa's advisory counsel. In *S.B. v. State*, we recognized that an advisory attorney appointed to help an unrepresented litigant present a case pro se does not serve the function of representing the litigant as an attorney.[26] Accordingly, we held that pro se defendants ordinarily may not raise claims of ineffective assistance against advisory counsel.[27] We identified only one exception to this rule, stating that an ineffective assistance claim could be raised "when the advisory counsel oversteps his limited role and assumes a degree of control consistent with legal representation."[28]

Alyssa makes no claim that her advisory counsel overstepped her bounds and took

---

a case only when it appears 'patently unreasonable' or when 'a fair-minded person could not rationally come to [the same] conclusion on the basis of known facts.'" *Carr*, 152 P.3d at 458 (alteration in original) (quoting *Long v. Long*, 816 P.2d 145, 156 (Alaska 1991)).

**22.** *See Alyssa B. I*, 123 P.3d at 648–50.

**23.** *Id.* at 648.

**24.** *Id.* at 649–50 (alteration in original) (internal quotation marks and citations omitted).

**25.** *Stanley B. v. State, DFYS*, 93 P.3d 403, 408–09 (Alaska 2004) (citing *S.B. v. State, Dep't of Health & Soc. Servs., DFYS*, 61 P.3d 6, 10 (Alaska 2002)).

**26.** *S.B.*, 61 P.3d at 15.

**27.** *Id.* (citing *Downey v. People*, 25 P.3d 1200, 1203 (Colo.2001)).

**28.** *Id.* (citing *Downey*, 25 P.3d at 1204).

control of the case.[29] Because Alyssa's complaint is that the public defender did too little, and not too much, she therefore does not fall under the exception to the rule. As we put it in *S.B.*, "from the moment she decided to represent herself she lost the right to claim that any subsequent acts of advisory counsel constituted ineffective assistance."[30]

### 4. Due process rights

#### a. Conducting termination trial without her

■ Alyssa argues that the trial court violated her due process rights by conducting the termination trial in her absence and over her objection. She claims that she was "unable to proceed with the termination trial due to [her] situation" and that she was not given sufficient notice to appear.

■ Whether a parent's due process rights were violated in a termination proceeding is a question of law that we review de novo.[31] We set out the test for determining the requirements of due process in CINA proceedings in *D.M. v. State:*

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[32]

■ In this case, Alyssa's private interest affected by the official action is of great importance: "parental rights are 'of the highest order.' "[33] As to the second factor, "[t]he crux of due process is [the] opportunity to be heard and the right to adequately represent one's interests. The provision of adequate notice commonly guarantees these rights."[34] The state maintains that the superior court took ample measures to provide Alyssa with adequate notice of the upcoming termination trial. Though Alyssa claimed at the beginning of trial that she had only received notice a week before the trial date, the record shows that the court made multiple attempts to provide her with notice. At trial, Judge Smith discussed the court's efforts to notify Alyssa:

> I double checked the log notes, and [Alyssa] was called while the motion for me to recuse myself was pending in front of Judge Suddock and so she was called and told basically we'll be in touch. And then we had a hearing the following week [May 18] and at that hearing we had a new address for [Alyssa], Mr. Winterrowd was there, we had a new address for [Alyssa], we didn't have a phone number for her. And so we didn't call her that day, but the notice of the hearing was sent out to her right after that to her address in Oregon. She then moved, and the address was sent and July 25th we got a notice that she was in California, and staff immediately sent the notice of hearing on July 25th, so she actually had quite a bit of notice that this hearing was happening.... And she spoke with Cindy Holtmann at some point after that, and Ms. Holtmann told her again when the hearing was.

The due process analysis in this case requires consideration of the government's in-

---

29. A review of the record confirms that the public defender's conduct at the termination trial did not rise to the level of active representation—near the end of trial, the public defender noted her limited role as advisory counsel and merely restated Alyssa's position that she was against termination.

30. *S.B.*, 61 P.3d at 15.

31. *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005).

32. *D.M. v. State, DFYS*, 995 P.2d 205, 212 (Alaska 2000) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

33. *Id.* (quoting *In re J.L.F. & K.W.F.*, 828 P.2d 166, 170 (Alaska 1992), *overruled on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996)).

34. *Id.* at 213–14 (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

terest that the termination trial proceed as scheduled. Under CINA Rule 18(e), a trial on a petition to terminate parental rights must be held within six months after the date on which the petition is filed, unless the court finds good cause is shown for a continuance.[35] When determining whether to grant a continuance for good cause, the court must consider "the age of the child and the potential adverse effect that the delay may have on the child."[36] Here, the termination petition was filed on March 23, 2005, yet the trial was not held until August 9, 2006—over sixteen months later.

As the state points out, the delay in trial was caused by Alyssa's "numerous motions to dismiss the case and disqualify the judge, requests to change court-appointed attorneys and advisory counsel, and appeals from trial court rulings."[37] The superior court accordingly made an express finding that Alyssa's failure to appear at trial was yet another attempt to delay the proceedings: "[M]y finding is that [Alyssa's] effort today to continue this yet again is just an ongoing effort to delay this trial . . . and at this point I find that it is not appropriate or in the best interests of this child that we delay it any more and that there's absolutely no good cause to continue this trial yet again." The superior court's finding that Alyssa was deliberately avoiding trial demonstrates that extraordinary circumstances existed so that it was not improper for the trial court to proceed with the trial without Alyssa's participation.

Furthermore, we also call attention to the interests of Jaclyn, which are of paramount importance. Jaclyn was last removed from Alyssa's custody in May 2002, when she was one and a half months old, and apart from a brief period spent in the custody of her father, has been in foster homes for all of her life. The superior court found at trial that the child needed "permanency in the worst way." The court also found that the child was in a good setting with foster parents who wanted to adopt her and it determined that denying the termination petition would put the child in an "unsettled situation." The superior court thus correctly recognized that if Alyssa caused the termination trial to be delayed yet again, Jaclyn's interests would have been seriously harmed.

Given the circumstances created by Alyssa herself, we do not see any "additional or substitute procedural safeguards" the superior court could have taken to guarantee Alyssa's presence at trial. The court kept updated records of Alyssa's address, it sent notice of the trial to her at two separate addresses with the last notice being sent more than two weeks before the trial date, and it informed her again of the trial date when she spoke

**35.** CINA Rule 18(e).

**36.** *Id.*

**37.** Alyssa made the following filings after the state's termination petition was filed: May 2, 2005 Motion to Dismiss and Grant Sole Legal and Physical Custody to Natural Mother; May 2, 2005 Notice of Change of Judge (Peremptory Challenge: Disqualification of Judge); May 13, 2005 Expedited Motion to Stay CINA Trial Court Proceedings Pending Appeal; May 23, 2005 Expedited Motion for Continuance; May 31, 2005 Motion to Disqualify Judge Eric Smith and Demand for an Evidentiary Hearing; June 6, 2005 Petition to Terminate State's Custody and Demand for an Evidentiary Hearing; June 6, 2005 Motion to Dismiss and Demand for a Misconduct Hearing; June 20, 2005 Motion to Compel GAL; June 28, 2005 Reply to Opposition to Motion to Disqualify Judge Eric Smith and Demand for an Evidentiary Hearing; July 5, 2005 Motion to Dismiss and Grant Sole Legal and Physical Custody to Natural Father; July 12, 2005 Motion to Strike the Petition for Termination of Parental Rights; July 19, 2005 Reply to Opposition to Petition to Terminate State's Custody and Demand for an Evidentiary Hearing and Motion to Dismiss and Demand for a Misconduct Hearing; July 25, 2005 Motion for Placement of [Daughter] with Blood Relative; November 10, 2005 Withdrawal of Request for Court Appointed Attorney; December 23, 2005 Expedited Motion for Continuance and an Extension of Time; February 16, 2006 Expedited Motion for Stay [of] the Termination Trial; February 17, 2006 Motion to Dismiss; February 17, 2006 Demand for Jurisdictional Hearing; April 11, 2006 Expedited Motion for Default Judgment; April 17, 2006 Motion for Independent Judge and Motion to Dismiss; April 17, 2006 Expedited Demand for an Evidentiary Hearing Before an Independent Judge; April 21, 2006 Objection and Reply to Response to Motion to Dismiss and Demand for Jurisdictional Hearing and Objection to Motions to Accept Late–Filed Responses; May 8, 2006 Motion for Reconsideration and Demand for an Evidentiary Hearing; and May 11, 2006 Motion of [Alyssa] in support of Order.

with court personnel via telephone. It was Alyssa's choice to waive her right to appointed counsel, to be on vacation in Mexico, and to refuse to participate telephonically at the trial. Taking these facts into account along with the state's and the child's strong interests in expeditiously finding a permanent home, we conclude that Alyssa was not deprived of procedural due process when the trial court held the termination trial without her.

### b. Calling witnesses at trial

■ In addition, as part of her claim that her rights were violated when the court conducted the trial without her, Alyssa argues that she was improperly prevented from calling witnesses at trial.[38]

Because we have concluded that it was proper for the trial court to proceed in Alyssa's absence after she voluntarily failed to appear, it follows that she cannot complain of prejudice she suffered by losing testimony that she could have presented if she had chosen to be present at trial. Moreover, although Alyssa names the various witnesses she would have called, she provides nothing to indicate that they would have given testimony materially disputing the issues at trial. The psychologist who screened Alyssa for depression, for instance, expressly disclaimed the evaluation's relevance to child custody, insisting that the evaluation did not cover Alyssa's parenting or custody issues.

### 5. Hearsay in the final order

■ Alyssa argues that the trial court erred by incorporating "previous 'hearsay' testimony" into its final order terminating her parental rights. But she does not specify what previous testimony was used in error. The department suggests that Alyssa is challenging the termination order's language incorporating findings based on testimony presented at the adjudication.

■ At the termination stage, a trial court may rely on findings entered at the adjudication stage when they are made by clear and convincing evidence.[39] Here there is no indication that the superior court admitted hearsay testimony at the adjudication hearing—Alyssa gives no examples of the testimony that she characterizes as hearsay and does not point to any objections to such evidence raised at the hearing on adjudication. Because Judge Smith found by clear and convincing evidence that Jaclyn was a child in need of aid at the adjudication hearing and because Alyssa has failed to point out any inadmissible hearsay in the adjudication findings, we find no error in the superior court's reliance on those findings in its final order of termination.

### 6. Alyssa's documentary evidence

■ Alyssa alleges that she submitted four psychological evaluations to the court indicating that she did not have a mental illness. She claims that the court ignored those evaluations and failed to acknowledge that she completed her case plan.

It is only apparent from the record that Alyssa submitted two documents to the department containing psychological information. One document was a brief, handwritten progress report prepared by an unidentified psychologist on December 4, 2003. It does not appear to set out any formal diagnosis. The second document was a psychological evaluation from Dr. Anita Kemp, who Alyssa claimed was going to testify at trial on her behalf. Dr. Kemp's evaluation stated that there was no current evidence that Alyssa suffered from depression.

The superior court did not ignore Dr. Kemp's evaluation, but rather found it to be unreliable for several reasons. First, Alyssa had not advised the department before the evaluation so that it could communicate with Dr. Kemp about the purposes of the evalua-

---

**38.** Alyssa claims that she had served subpoenas on an assistant attorney general, her public defender advisory counsel, and the guardian ad litem in order for them to testify as hostile witnesses about their "cooperative agreements" for gaining custody of Alyssa's child. She also claims that a psychologist who evaluated her, and Judge Julie Macek of Montana, who found that Alyssa did not have a serious mental illness and therefore ordered the state of Montana to return Alyssa's son to her custody, would have testified on her behalf had she been present.

**39.** *D.M.*, 995 P.2d at 209.

tion and provide the doctor with collateral information. Second, the court found that Alyssa had "thoroughly misled" Dr. Kemp by circling zero for every indicator of depression and mental illness when Dr. Kemp evaluated her. And finally, during the trial, the state published into the record a more recent letter from Dr. Kemp stating that her earlier evaluation was not applicable in a matter of child custody because Dr. Kemp did not cover Alyssa's parenting or custody issues during the evaluation.

We have consistently held that "it is the role of the trial court, and not this court, to judge the credibility of any witnesses and to weigh conflicting evidence."[40] Because the record showed that Dr. Kemp's evaluation was not fully informed and was not directed to the custody issue, the superior court could properly discount the evaluation and give more weight instead to the testimony of the department's expert psychologist, who testified that Alyssa suffered from severe psychological problems.

### 7. Placement with blood relatives

■ Alyssa argues that the superior court erred by denying her requests to place Jaclyn with blood relatives. The record shows that on July 25, 2005, Alyssa filed six motions seeking to place Jaclyn with various blood relatives under AS 47.14.100(e).[41] The superior court denied the motions. Alyssa did not seek review of the court's ruling at the time it was made. There is currently no need to consider the placement decision, because "the superior court's termination order now renders earlier issues of placement

moot."[42] Accordingly, we decline to decide this claim.

### 8. Request to change foster placement

■ Alyssa claims that she made many motions to remove Jaclyn from abusive foster homes but those motions were ignored by the court. On June 15, 2005, Alyssa moved for a placement review hearing "to determine the best interests" of Jaclyn, alleging that the state had placed the child in several foster homes where she had been physically and potentially sexually abused. On July 11, 2005, the superior court denied the motion. Because the denial was a final, appealable order, Alyssa was required to file a timely appeal in order to preserve this issue for appellate review.[43] Since she did not timely appeal the order,[44] we decline to consider the issue here.

### 9. Hearsay and opinion testimony at trial

Alyssa also contends that the court wrongly allowed the state's witnesses to provide hearsay and opinion testimony at the termination trial. This section of Alyssa's brief consists of two sentences and provides no citations to the trial log notes for examples of impermissible hearsay or opinion testimony.

■ Given Alyssa's failure to identify any inadmissible hearsay, the state plausibly suggests that Alyssa objects to the testimony of the department's expert psychologist, Dr. Michael Rose. Dr. Rose testified after reviewing various records that, in his opinion, Alyssa suffered from "severe psychological

---

**40.** *Martin v. Coastal Vills. Region Fund,* 156 P.3d 1121, 1129 (Alaska 2007) (citing *Silvan v. Alcina,* 105 P.3d 117, 122 (Alaska 2005)).

**41.** AS 47.14.100(e) provides in part that:
(e) When a child is removed from a parent's home, the department shall place the child, in the absence of clear and convincing evidence of good cause to the contrary,
(1) in the least restrictive setting that most closely approximates a family and that meets the child's special needs, if any;
(2) within reasonable proximity to the child's home, taking into account any special needs of the child and the preferences of the child or parent;

(3) with, in the following order of preference, (A) an adult family member[.]

**42.** *Erica A. v. State, Dep't of Health & Soc. Servs., DFYS,* 66 P.3d 1, 10 (Alaska 2003); *see also Martin N. v. State, Dep't of Health & Soc. Servs., DFYS,* 79 P.3d 50, 57 (Alaska 2003).

**43.** *See Owen M. v. State, OCS,* 120 P.3d 201, 203 (Alaska 2005) (citing *S.S.M. v. State, Dep't of Health & Soc. Servs., DFYS,* 3 P.3d 342, 345 (Alaska 2000) (holding order denying placement of child in need of aid with his sister was final, appealable order)).

**44.** *See* Alaska R.App. P. 204(a)(1).

problems," and awarding custody to her would place Jaclyn at risk of harm. The state argues that Dr. Rose was qualified to offer his opinion as an expert in clinical psychology; it points out that Dr. Rose testified that it was customary for an expert in his field to rely on the types of documents he used in forming his opinion. Accordingly, the state contends, his testimony was "explicitly allowed" under Evidence Rules 702 and 703.[45]

The state's position has merit. Under Evidence Rules 702 and 703, Dr. Rose's testimony did not involve inadmissible hearsay—it was admissible as expert scientific opinion. Because Alyssa identifies no other evidence addressed in her hearsay claim, we conclude that her claim lacks merit.

### D. Termination Based on Alyssa's Mental Illness

 Alyssa argues that the superior court improperly used her "past or present or future mental illness to terminate [her] parental rights." She relies on our statement in *V.S.B. v. State* that "[m]ental illness,

absent related conduct, cannot be a basis for termination of parental rights." [46]

We first observe that the department's petition for termination was based on the grounds that Jaclyn was a child in need of aid under five separate provisions of Alaska law: AS 47.10.011(1), (6), (8)(B)(i), (9), and (11).[47] At the conclusion of the trial, the superior court found by clear and convincing evidence that Jaclyn was a child in need of aid under two alternative grounds: Alyssa's mental illness under AS 47.10.011(11) and Alyssa's abandonment of Jaclyn under AS 47.10.011(1). Because either finding alone would support the termination order and because Alyssa does not challenge the court's finding of abandonment, her challenge to the mental illness finding has no impact on the outcome of the case.

In any event, we conclude that Alyssa's argument regarding mental illness lacks merit, since the trial court did not terminate her parental rights merely because she suffered from a mental illness. Although the expert testimony at trial certainly supported the conclusion that Alyssa suffered from chronic depression and borderline personali-

---

45. Alaska R. Evid. 702(a) provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 Alaska R. Evid. 703 provides:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.

46. *V.S.B. v. State, Dep't of Health & Soc. Servs., DFYS*, 45 P.3d 1198, 1206 n. 22 (Alaska 2002).

47. AS 47.10.011 provides in relevant part:
 Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
 (1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
 . . . .

(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately;
. . . .
(8) conduct by or conditions created by the parent, guardian, or custodian have
. . . .
(B) placed the child at substantial risk of mental injury as a result of
(i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury;
. . . .
(9) conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect;
. . . .
(11) the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury[.]

ty disorder, the superior court did not ground its termination order on these signs of mental illness alone. Instead, the court relied on specific conduct by Alyssa that would continue to place Jaclyn at risk if she were placed in Alyssa's custody: Alyssa's complete refusal to work with the department and her consequent failure to develop any attachment or bond with Jaclyn in the three years since Jaclyn's birth. The court emphasized that Alyssa also refused to get psychological treatment and had not taken the first step of obtaining a valid psychological evaluation in accordance with her case plan. And it further found that Alyssa was completely unable to cooperate with authority figures, expressing concern that she would not be able or willing to get adequate help for Jaclyn if the child needed it for medical or other problems.

We conclude that the superior court adequately combined the finding that Alyssa suffered from a mental illness to evidence of actual, conduct-based problems creating a risk of substantial harm to Jaclyn. Because the court's decision to terminate Alyssa's parental rights was not based on her mental illness alone, we affirm the superior court's ruling that Jaclyn was a child in need of aid under AS 47.10.011(11).

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's order terminating Alyssa's parental rights to Jaclyn.

MATTHEWS, Justice, not participating.